**2020 UT App 50**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.T., J.T., AND K.B.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

K.B.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20190591-CA
Filed March 26, 2020

Fourth District Juvenile Court, Provo Department
The Honorable Suchada P. Bazzelle
No. 1160859

Daniel H. Shen and Margaret P. Lindsay, Attorneys
for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and KATE APPLEBY concurred.

HARRIS, Judge:

¶1     After eight-year-old A.T. called authorities to report that
her mother (Appellant K.B., herein referred to as Mother) had
overdosed on drugs, the State of Utah's Division of Child and
Family Services (DCFS) took custody of A.T. and her brother J.T.
(the Children) and placed them—at least temporarily—with
their biological father (Father). After attempting for eight months
to reunify the Children with Mother, the juvenile court decided

to terminate reunification services and award Father permanent custody and guardianship of the Children. In making its decision, the court relied heavily on a principle of "parental presumption." That principle, as articulated by the juvenile court, does not apply in this case, and therefore the court incorrectly relied upon it. And given some of the statements the court made in arriving at its decision, we are not convinced that the court would have made the same decision, at least at that time, had it not so heavily relied on the parental presumption. Accordingly, we vacate the juvenile court's order and remand this case for further proceedings.

BACKGROUND

¶2     Mother and Father divorced in December 2013. Following the divorce, Mother was awarded sole custody of the Children; at the time, A.T. was three years old and J.T. was two. Several months later, in May 2014, Mother married Stepfather, and about a year later gave birth to a third child, whose initials (like Mother's) are also K.B. (Brother).

¶3     On June 21, 2018, Mother overdosed on an unknown substance. Both of the Children were in the house at the time, and A.T.—who was then eight years old—called 911. Mother was transported to the hospital and given life-saving treatment, though she refused to tell medical or law-enforcement personnel what substance she had overdosed on. Additionally, Mother refused to provide names and contact information for additional caregivers for the Children, prompting law enforcement to contact DCFS to take emergency physical custody of the children. Shortly thereafter, Father contacted DCFS, which later placed the Children with Father on a temporary basis.

¶4     DCFS's petition for custody of the Children, filed with the juvenile court on the day after Mother's overdose and amended a few weeks later, sought abuse and neglect findings as to

Mother and a dependency finding as to Father.[1] At adjudication hearings held early in the case, the juvenile court found the Children to be dependent as to Father and neglected as to Mother. Neither parent has, at any point, contested those findings. After adjudication, the court kept the Children in DCFS custody and placed them with Father on a temporary basis. The court set a permanency goal of reunification with Mother, with a concurrent plan of "permanent custody and guardianship with a relative," for which Father would be "first in line," and ordered that Mother receive reunification services pursuant to a child and family plan.

¶5    As part of that child and family plan, the court ordered Mother to, among other things, complete mental health and substance abuse assessments in a timely manner, including following all recommendations of those assessments; maintain stable and appropriate housing; and maintain a legitimate means of financially supporting her children. Finally, the court warned Mother that failure to comply with its order could result in termination of reunification services, a change in the permanency goal, or even termination of parental rights.

¶6    Over the course of the next few months, the court held two review hearings to learn how Mother was doing with her reunification efforts. At those hearings, DCFS reported that Mother was doing quite well with the substance abuse side of the reunification plan—she not only had completed her

---

1. DCFS's petition also discussed Mother's third child, Brother, but DCFS did not seek custody of Brother; instead, it asked the juvenile court to award custody and guardianship of Brother to Stepfather, who is Brother's biological father. The juvenile court's determinations regarding Brother are not directly at issue in this appeal, and reference to Brother and Stepfather are included here only as background.

assessment, but also had completed drug treatment, and her drug tests had come back clean. Mother also was consistent with her in-person visits with the Children, though she was inconsistent with telephonic visitation. However, even after eight months, Mother had not found acceptable housing, had not found suitable employment, and had not yet completed a mental health assessment, let alone any treatment or counseling.

¶7 In February 2019, DCFS—eventually joined by the guardian ad litem (GAL)—asked the juvenile court to terminate reunification services, given Mother's lack of complete compliance with the plan. At the hearing on DCFS's motion, Mother pointed out that she was in compliance with a great many of the plan's requirements, and that she was excelling with regard to the substance abuse aspects of it. She also asked the juvenile court to afford her additional time to complete the remaining items, including the mental health assessment, and represented to the court that she could at least come close to full compliance with the plan, given additional time. The court rejected these arguments, and granted DCFS's motion to terminate reunification services at the eight-month mark.

¶8 In making its ruling, the juvenile court was heavily influenced by its perception of the "parental presumption," a legal principle discussed more fully below and which was first introduced into our jurisprudence by our supreme court in *Hutchison v. Hutchison*, 649 P.2d 38 (Utah 1982). No party had mentioned the parental presumption in briefing prior to the hearing. The court began its oral ruling by referencing the parental presumption, stating that in this case there had been "a neglect finding against the mother, which does rebut the parental presumption in favor of the mother," but stating that the dependency finding against Father did not rebut his parental presumption, because it was "a no fault finding." Thus, the court framed the issue like this: "we have one parent whose parental presumption is rebutted and one whose isn't." The court went

on to clarify that "just from a legal standpoint, the father's claims are superior to anybody else's claims in the courtroom," and that the court did not "have any findings against him that would rebut that standing." Against that backdrop, the juvenile court then transitioned to a discussion of Mother's compliance with the reunification plan, stating as follows:

> Nothing entitles [Mother] to a full twelve months [of reunification services], and on that issue . . . I think if I had a neglect finding against [Father] or we didn't have a dad, we'd probably keep working at [Mother's reunification goal]; but that's not where we are. I have a father with an unrebutted presumption who wants custody.

¶9 The juvenile court then looked specifically to Mother's non-compliance with the plan, stating that "[w]e have been in progress for eight months and [Mother] has done some things, but she's lacking at this point some pretty important parts," including housing and employment. The juvenile court also noted that Mother had not completed even a mental health assessment, let alone any treatment, and that her failure to complete the assessment within the first eight months meant that she likely would not be able to complete the necessary mental health treatment within the twelve-month period mandated by statute, absent exceptional circumstances, for completion of reunification services. *See* Utah Code Ann. § 78A-6-314(6) (LexisNexis Supp. 2019). After considering these facts, the juvenile court summed up its ruling:

> By the time [Mother] gets [a mental health] assessment . . . I just don't think it's going to make that much of a difference at this point. When I weigh that against the father's superior claim for these children . . . I think that legally I need to terminate reunification services.

¶10    Following the hearing, the juvenile court memorialized its holding in a written order, which noted that "we have one parent whose parental presumption is rebutted and one parent whose parental presumption is unrebutted," as well as that "[Mother] has not started with her mental health assessment and this . . . is one of the longest running part[s] of this reunification process," and that even "[i]f this Court were to give her a full 12 months" to complete the plan, "there just isn't enough time left." The court ordered reunification services terminated, and ordered that the Children be placed in the "permanent physical and legal custody" of Father, with Mother to receive periodic visitation.

ISSUES AND STANDARDS OF REVIEW

¶11    Mother now appeals from the juvenile court's order. Mother's chief argument is that the juvenile court committed legal error by misconstruing the parental presumption; Mother asserts that this error influenced the court's decision to terminate her reunification services.[2] Mother's challenge to the juvenile court's application of the law, including its interpretation of the parental presumption, presents a legal issue, which we review for correctness.[3] *In re F.L.*, 2015 UT App 224, ¶ 10, 359 P.3d 693.

---

2. Mother also asserts that, even if the juvenile court did not commit legal error in its evaluation of the parental presumption, the adjudicated facts still do not support the court's decision to terminate reunification services. Given our resolution of the other issues in this appeal, we need not consider this argument.

3. The State takes the position that Mother failed to preserve any challenge to the juvenile court's application of the parental presumption. It points out that Mother never asked the juvenile

(continued…)

Because we conclude that the juvenile court misapplied the parental presumption, we must then evaluate the argument, made by the GAL and the State, that any error was harmless. The concept of harmless error is applicable to juvenile court decisions. *See, e.g., In re W.A.*, 2002 UT 127, ¶ 36 n.11, 63 P.3d 607; *In re B.C.*, 2018 UT App 125, ¶ 6, 428 P.3d 18; *see also* Utah R. Juv. P. 2(a) (stating that "the Utah Rules of Civil Procedure shall apply" to juvenile court proceedings involving "neglect, abuse, [or] dependency," unless the civil rules are inconsistent with the juvenile rules); Utah R. Civ. P. 61 ("No error or defect in any ruling or order . . . is ground for granting a new trial or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice"). An error is harmless if it is "sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings." *In re W.A.*, 2002 UT 127, ¶ 36 n.11 (quotation simplified).

---

(…continued)

court to address the issue, and did not challenge the court's application of the presumption after it had issued its ruling. But the juvenile court raised the issue sua sponte, and made the issue a central part of its ultimate ruling. Under these circumstances, the issue was preserved for appellate review. *See Help v. Chevron U.S.A., Inc*, 2015 UT 81, ¶ 42, 361 P.3d 63 (stating that, "[w]here a district court itself raises and then resolves an issue sua sponte, it obviously had an opportunity to rule on the issue," and these circumstances "satisf[y] the basic purposes of the preservation rule"); *see also Kell v. State*, 2012 UT 25, ¶ 11, 285 P.3d 1133 (holding that an issue was preserved for appeal when "the district court not only had an opportunity to rule on the issue . . . [but] it did rule on it"); *State v. Cowlishaw*, 2017 UT App 181, ¶ 21, 405 P.3d 885 (holding that an issue was preserved when "the [district] court addressed the issue sua sponte").

ANALYSIS

I

¶12 Our supreme court first introduced the concept of a "parental presumption" into our case law several decades ago, in *Hutchison v. Hutchison*, 649 P.2d 38 (Utah 1982). At the center of that case was a dispute "between former spouses over the custody of a child born to the wife before their marriage." *Id.* at 39. A "blood test" confirmed that the husband was not the biological father of the child, and he had apparently not legally adopted the child, but the court noted that he had "in every way" treated the child as his own and that the child viewed him as her father. *Id.* at 39–40. Despite the husband's lack of a biological or legal connection to the child, the district court placed both mother and husband on equal footing for purposes of its custody determination, and used a simple best-interest test to determine custody, finding that it would be in the child's best interest for the husband to have custody. *Id.* at 40. Our supreme court held that this analysis was incorrect, stating that, in a dispute over custody between two natural parents,[4] "the paramount consideration is the best interest of the child, but where one party to the controversy is a nonparent, there is a presumption in favor of the natural parent," even if an ordinary best-interest inquiry would come out in favor of the nonparent. *Id.* The court based this presumption on "the common experience of mankind, which teaches that parent and child normally share a strong attachment or bond for each other, [and]

---

4. Utah's Juvenile Court Act defines "natural parent" as "a minor's biological or adoptive parent, and includes the minor's noncustodial parent." *See* Utah Code Ann. § 78A-6-105(38) (LexisNexis Supp. 2019). As mandated by statute, we employ this definition for the purposes of our analysis.

that a natural parent will normally sacrifice personal interest and welfare for the child's benefit." *Id.* The court noted, however, that the parental presumption was "not conclusive" and was subject to being rebutted, but that it "cannot be rebutted merely by demonstrating that the opposing party possesses superior qualifications, has established a deeper bond with the child, or is able to provide more desirable circumstances." *Id.* at 41. Indeed, the court held that

> the parental presumption can be rebutted only by evidence establishing that a particular parent at a particular time generally lacks all three of the characteristics that give rise to the presumption: that no strong mutual bond exists, that the parent has not demonstrated a willingness to sacrifice his or her own interest and welfare for the child's, and that the parent lacks the sympathy for and understanding of the child that is characteristic of parents generally. The presumption does not apply to a parent who would be subject to the termination of all parental rights due to unfitness, abandonment, or substantial neglect, since such a parent is a fortiori not entitled to custody.

*Id.* Unless the parental presumption is rebutted, a natural parent will always prevail in a custody battle with a nonparent, even if a best-interest analysis would counsel otherwise. On the other hand, if the presumption is rebutted, then the parent and the nonparent "compete on equal footing," and the court should make a custody decision that is in the best interest of the child, with no inherent preference for the natural parent. *Id.*

¶13 As demonstrated by the facts of *Hutchison*, the parental presumption was introduced into our jurisprudence in a case involving a dispute between a natural parent and an individual without a biological or legal connection to the child. Since

*Hutchison*, both this court and our supreme court have continued to apply the parental presumption in appropriate cases, but always in cases, like *Hutchison*, involving a custody dispute between a natural parent and a nonparent. *See, e.g., In re K.F.*, 2009 UT 4, ¶ 69, 201 P.3d 985; *Kishpaugh v. Kishpaugh*, 745 P.2d 1248, 1250–53 (Utah 1987); *Davis v. Davis*, 2001 UT App 225, ¶¶ 7–13, 29 P.3d 676; *Duncan v. Howard*, 918 P.2d 888, 891–94 (Utah Ct. App. 1996). The parties have not directed us to—and we are not independently aware of—any Utah case in which the parental presumption as conceived in *Hutchison* has been applied in a dispute between two natural parents. Based on this absence of case law, Mother asserts that "the presumption does not apply in parent-to-parent custody matters," and we acknowledge that this position has significant force.

¶14    But in this case, we need not determine the inapplicability of the parental presumption on that basis. Even assuming— without deciding, and only for the purposes of the analysis— that the parental presumption could conceivably apply in a dispute between two natural parents, it does not apply in this case, because here both parents lost the presumption, given the uncontested findings made by the juvenile court regarding neglect (against Mother) and dependency (against Father). As the GAL points out,[5] our supreme court has clearly stated that the presumption "does not apply . . . to cases brought before the juvenile court on abuse, neglect, and dependency petitions." *See In re K.F.*, 2009 UT 4, ¶ 69 (quotation simplified). Parental rights, though "fundamental," "are not absolute." *See Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 74, 250 P.3d 465 (quotation

---

5. The GAL agrees with Mother that the juvenile court incorrectly applied the parental presumption in this case, specifically asserting that "[t]he juvenile court's claim that Father retained the parental presumption was legally wrong." As noted, in our view the GAL's position is correct.

simplified). "A parent's rights must be balanced against the state's important interest in protecting children from harm." *Id.* In cases in which abuse, neglect, or dependency is established, the usual parental presumption that prevents the State (a nonparent) from intervening in parental decision-making no longer applies, and the State (supervised by the juvenile court) may take custody of children, even over their parents' objections, and place them appropriately.

¶15    In this case, Mother was the subject of a neglect petition, and Father was the subject of a dependency petition; the court entered affirmative findings on each, and those findings are uncontested here. Accordingly, even if we assume that the parental presumption could potentially apply to some parent-versus-parent contests, it cannot apply to this one, because in this case neither parent is entitled to its benefits. The neglect finding against Mother rebuts any parental presumption she might have, and the dependency finding against Father rebuts any parental presumption he might have. In a case like this one, the court is free to make its determinations about placement of the Children solely on best interest and on the other provisions of the Juvenile Court Act, without deferring to any parental presumption as envisioned in *Hutchison*. Accordingly, the juvenile court erred by concluding that a *Hutchison*-style parental presumption existed here in favor of Father.

II

¶16    However, all of this is not to say that Father enjoys no advantages over Mother, given the facts of this case, when it comes to making a best-interest determination with regard to the Children. Even though a dependency finding erases any *Hutchison*-style parental presumption that may have existed in favor of Father, *see In re K.F.*, 2009 UT 4, ¶¶ 66–69, 201 P.3d 985, the juvenile court correctly noted that a dependency finding is, after all, a "no fault" finding, *see* Utah Code Ann. § 78A-6-105(14)

(LexisNexis Supp. 2019) (defining a "dependent child" as "a child who is homeless or without proper care through no fault of the child's parent"), and is in that respect significantly different from a finding of abuse or neglect. In this vein, the GAL and the State assert that, even if the juvenile court erred in its application of the parental presumption, it did not err in making the ultimate decision to terminate reunification services and place the Children with Father. Essentially, the GAL and the State argue that any legal error the juvenile court made in its application of the parental presumption was harmless here, and that the court would almost certainly have placed the Children with Father in any event, given that Father had not been found to have abused or neglected the Children, and given that there was no evidence that he was in any other way unfit or unable to care for the Children. As noted above, "[h]armless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings." *In re B.C.*, 2018 UT App 125, ¶ 6, 428 P.3d 18 (quotation simplified). While we acknowledge that the harmless error argument advanced by the GAL and the State is not without force, we are ultimately unconvinced—given the tenor of some of the juvenile court's statements in the course of making its ruling—that there is no reasonable likelihood that the juvenile court's legal error affected the result. Under these circumstances, we are unable to affirm the juvenile court's ultimate decision on the harmless error grounds suggested by the GAL and the State.

¶17 At the outset of the court's analysis, it stated that it had "a neglect finding against the mother, which does rebut the parental presumption in favor of the mother," and that it had "a dependency finding as to [Father], which was a no fault finding," and that therefore it had "one parent whose parental presumption is rebutted, and one whose isn't," and that "from a legal standpoint, the father's claims are superior to anybody else's claims in the courtroom." Then, with "that being said," the

court moved on to discuss reunification services, noting that "we've given it a really good try" and finding that, "[a]t eight months" the State "has made reasonable efforts" to provide reunification services to Mother. In the very next paragraph, however, the court returned to the parental presumption, and stated that if it "had a neglect finding against [Father] or we didn't have a [d]ad, we'd probably keep working" at the goal of reunification with Mother. And again, at the end of its ruling, it weighed Mother's partial compliance with the plan "against the father's superior claim," and concluded that it "legally . . . need[ed] to terminate reunification services and grant the State's motion and the father's request for custody at this time."

¶18 The court's statements make plain that its analysis was highly dependent upon its understanding of the parental presumption. Based on what it understood about the law governing such presumptions, the court considered itself legally bound to make a ruling in Father's favor, and even went so far as to state that, absent a parental presumption in favor of Father, it would probably have given Mother additional time to complete the requirements of the plan. Under these circumstances, we are uncomfortable with the GAL's and the State's suggested conclusion that the juvenile court would have reached the same decision anyway. In this case, we think it best to remand this matter to the juvenile court so that it may hold another permanency hearing at which it should reconsider the matter anew without being unduly influenced by a belief that a *Hutchison*-style parental presumption drives the outcome.

¶19 We take pains to point out, however, that we are not attempting to instruct the juvenile court to reach one particular outcome or another, or to imply that the ultimate result the juvenile court reached was necessarily the wrong one. As we have already pointed out, Father has certain advantages in this proceeding, given that he is a natural parent of the Children and has not been found to have abused or neglected them. But given

the dependency finding, any advantages he might enjoy are specific to the facts of the case and become relevant at the best-interest stage of the analysis; his advantages are not the result of a *Hutchison*-style parental presumption in his favor. Given the findings pertinent to both parents, in this case the juvenile court is tasked with placing the Children in accordance with the Juvenile Court Act and with their best interest, and is not bound to favor one side simply because of any parental presumption.

¶20   On remand, and among other things, the juvenile court should consider "whether the [Children] may safely be returned to the custody of [their] parent," Utah Code Ann. § 78A-6-314(2)(a), or whether there is a "substantial risk of detriment" to the Children's well-being in doing so, *id.* § 78A-6-314(2)(b). In making this determination, the court may consider various factors, including Mother's level of "participat[ion] in a court approved child and family plan," *id.* § 78A-6-314(2)(c)(i)(A). The court may also consider whether to extend additional reunification services to Mother, an inquiry that includes consideration of whether extension of additional services "is in the best interest of" the Children. *See id.* § 78A-6-314(7)(a)(iii).

CONCLUSION

¶21   We vacate the juvenile court's order terminating reunification services and establishing permanent custody and guardianship of the Children with Father. As explained herein, we do so not necessarily because we consider the result the juvenile court reached to be ultimately incorrect, but because the juvenile court committed legal error in the course of making its ruling, which error we cannot here label "harmless." We remand for a new permanency hearing, at which the juvenile court should reach the result it believes is dictated by the Juvenile Court Act and by the best interest of the Children, and not by any parental presumption.

_____