2024 UT App 91

## THE UTAH COURT OF APPEALS

IN THE INTEREST OF R.D. AND Z.J.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

K.J.,
Appellant,
*v.*
N.J. AND A.J.,
Appellees.

Opinion
No. 20220798-CA
Filed June 27, 2024

Second District Juvenile Court, Ogden Department
The Honorable Debra J. Jensen
No. 1174368

K. Andrew Fitzgerald, Attorney for Appellant

Jason B. Richards, Attorney for Appellees

Martha Pierce, Guardian ad Litem

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1 A mother and her children were in the company of the mother's boyfriend as he allegedly robbed a business. The children had recently been adjudicated as abused by their father, who was living with the mother at the time of the abusive events, and were thus under the jurisdiction of the juvenile court. Fearing that this latest incident might result in the children being placed in foster care, the mother sent the children to her parents in Texas. The children have been in Texas ever since. After the children moved in with them, the grandparents intervened in the juvenile

court case and petitioned the court for guardianship and custody, which the court granted. The mother now appeals, asserting, in addition to other claims of error and ineffective assistance of counsel, that the juvenile court lacked jurisdiction to grant the guardianship and custody. We affirm on all grounds.

BACKGROUND[1]

¶2     K.J. (Mother) has two children (the Children) by the same man (Father)—a girl born in December 2015 and a boy born in January 2018.

¶3     In October 2018, law enforcement was dispatched to a disturbance at the family home. Father was intoxicated, had become "destructive," and was "not making much sense." Father was transported to the hospital. Within a few days of this incident, Mother sent the Children to live with her parents, N.J. and A.J. (Grandparents), in Texas, where they stayed about three months.

¶4     In February 2019, law enforcement was again dispatched to the family home. Father was again found intoxicated, and he had locked Mother out of the residence. It was reported that Father would "jump on" Mother and "shake her."

¶5     In April 2019, law enforcement responded to a call involving aggravated assault at the family home. Father was yet again intoxicated, and he had pushed Mother into a wall of their apartment, an action that knocked her to the ground. Father had

---

1. We limit our discussion to "those background facts necessary to resolve the issues on appeal." *Blosch v. Natixis Real Estate Cap., Inc.*, 2013 UT App 214, ¶ 2 n.2, 311 P.3d 1042 (cleaned up). And we recite the evidence in a light most favorable to the juvenile court's findings. *See In re adoption of B.H.*, 2020 UT 64, n.2, 474 P.3d 981.

then grasped Mother from behind and had begun hitting her, giving her a bloody nose. Father had also choked Mother, causing her to nearly lose consciousness. The Children were present during this assault.

¶6    A few days after this incident, having received a referral regarding the Children, the Utah Division of Child and Family Services (DCFS) initiated a home visit. Mother admitted that law enforcement had been called to the home due to Father's "drinking and getting out of control." But she "minimized the domestic violence incidents," noting that that she could usually get the Children to bed and sleeping so they would not hear any of the parents' arguments. Mother asked the DCFS caseworker to tell Father that she still wanted "to be with him," but the caseworker advised Mother that doing so would be a violation of a no contact order that was in place. And as the caseworker was leaving the home, Mother said, "So what [you are] saying is the best thing I can do is go to court next week and ask for the no contact order to be dropped?" The caseworker responded that was not what was being communicated, and she discussed with Mother "the concerns of her failure to protect the [C]hildren from the ongoing domestic violence." Mother responded that she just wanted to speak with Father.

¶7    About a week later, DCFS spoke with Father, who was at this point incarcerated. He admitted that there had been a "scuffle" in which he had "knocked" Mother in the nose but claimed there had only been one physical altercation between the two of them.

¶8    In May 2019, DCFS initiated proceedings, pursuant to Utah Code section 80-3-201(1), by filing a petition for protective supervision services (PSS petition) that alleged the Children were

abused, neglected, or dependent.[2] Mother and Father both entered rule 34(e) pleas in response to the allegations contained in the PSS petition. *See* Utah R. Juv. P. 34(e) ("A respondent may answer by admitting or denying the specific allegations of the petition, or by declining to admit or deny the allegations. Allegations not specifically denied by a respondent shall be deemed true.").

¶9 In July 2019, the juvenile court determined that the Children were subject to the jurisdiction of the juvenile court and adjudicated them "abused children" by Father in that they "suffered non-accidental harm or threatened harm" when Father "committed domestic violence" in their presence by assaulting Mother. Accordingly, the court appointed a guardian ad litem (GAL) to represent the best interests of the Children; ordered DCFS to provide protective supervision services; ordered Mother and Father to comply with a family plan that included mental health assessments, a domestic violence assessment, completion of a parenting course, and maintenance of stable housing and income; and ordered Father to complete drug and alcohol assessment and treatment. The juvenile court further ordered Mother and Father to "have no contact with each other in the presence" of the Children.

---

2. While courts and practitioners frequently refer to a petition for protective supervision services, *see, e.g.*, *In re M.J.*, 2011 UT App 398, ¶ 2, 266 P.3d 850; *In re T.M.*, 2003 UT App 191, ¶ 2, 73 P.3d 959, the term does not formally exist in the juvenile code. Instead, Utah Code section 80-3-201(1) states that "any interested person may file an abuse, neglect, or dependency petition." The PSS petition filed by DCFS in this case referenced section 78A-6-304, which has since been renumbered and amended as section 80-3-201. *See* Act of Mar. 3, 2021, ch. 261, § 64, 2021 Utah Laws 1752, 1799–800.

¶10    Notably, the court made a custody determination at this juncture in two respects. First, at least impliedly, it determined that the Children would remain in the custody of Mother, albeit subject to the jurisdiction of the court pursuant to the provisions of the family plan. Second, it placed severe restrictions on Father's parent-time with the Children. Specifically, the court ordered that Father "shall not return to the family home until further order" of the court. And the court specified that "[v]isitation between [Father] and the [C]hildren shall be reasonable and supervised as approved by the [GAL], until further order of the [c]ourt."

¶11    Not long after the adjudication, Mother began a relationship with another man (Boyfriend). This relationship too was marked by incidents of domestic violence. In one instance, Boyfriend called police claiming that Mother tried to hit him with her car, while a witness said it was Boyfriend who jumped on the hood of Mother's car. But a more serious incident—at least insofar as it concerned the safety of the Children—happened when Boyfriend allegedly robbed an oil-change shop while Mother and the Children were with him in Mother's car. This prompted Mother, in October 2019, to arrange for the Children to go to Texas to live with Grandparents again. Mother was apparently "afraid that the [Children] would go to foster care if [authorities] thought [she] was involved in the robbery." The Children have been in Texas ever since.

¶12    In June 2020, Grandparents moved to intervene in the Children's welfare action and petitioned the juvenile court for temporary child custody. The court granted the motion and awarded them temporary custody. In an October 2020 hearing, the court changed the Children's permanency goal to permanent custody with a relative and terminated reunification services with Mother and Father. Also in October 2020, Grandparents petitioned for permanent custody and guardianship, which was supported by the GAL. Mother and Father opposed Grandparents' petition. As relevant here, Mother argued that

there had been a substantial and material change in her circumstances and requested the Children be returned to her custody. In December 2020, the court released DCFS from the case.

¶13 In August 2022, the juvenile court entered detailed findings, concluding that Mother had not changed her circumstances and that it was necessary for the welfare of the Children that Grandparents be awarded permanent custody and guardianship.[3]

¶14 Mother appeals.

ISSUES AND STANDARDS OF REVIEW

¶15 Mother first contends that the juvenile court lacked jurisdiction under the Utah Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), *see generally* Utah Code §§ 78B-13-101 to -318, to enter custody orders in favor of Grandparents. Whether a court has jurisdiction is a matter of law reviewed for correctness. *In re adoption of B.B.*, 2017 UT 59, ¶ 16, 417 P.3d 1.

¶16 Next, Mother argues that the juvenile court violated the Interstate Compact on the Placement of Children (ICPC), *see generally* Utah Code §§ 80-2-901 to -910, by failing to ensure that Grandparents were fit for custody of the Children prior to placement. "The proper interpretation and application of a statute is a question of law which we review for correctness." *In re adoption of B.H.*, 2019 UT App 103, ¶ 9, 447 P.3d 110 (cleaned up), *aff'd*, 2020 UT 64, 474 P.3d 981.

---

3. The court found that while Father had met the burden of proof showing a change in circumstances, a change of custody was nevertheless in the best interest of the Children.

¶17 Mother next asserts that her trial counsel (Counsel) was ineffective for failing to call her therapist to testify on her behalf regarding her current mental health status. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *In re C.M.R.*, 2020 UT App 114, ¶ 11, 473 P.3d 184 (cleaned up).

¶18 Mother lastly maintains that the juvenile court erred in applying an incorrect standard of proof, arguing that the custody dispute should have been governed by the parental presumption. The application of the correct standard of proof, including the juvenile court's "interpretation of the parental presumption, presents a legal issue, which we review for correctness." *In re A.T.*, 2020 UT App 50, ¶ 11, 464 P.3d 173.

ANALYSIS

I. Jurisdiction

¶19 Mother argues that the juvenile court lacked jurisdiction to consider Grandparents' custody petition because the Children had been residing in Texas for more than six months prior to the petition. Mother's argument is grounded in the UCCJEA, which states, in pertinent part, that

> a court of this state has jurisdiction to make an initial child custody determination only if . . . this state is the home state of the child on the date of the commencement of the proceeding[] or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.

Utah Code § 78B-13-201(1)(a). In developing this argument, Mother points to the definition of a child custody proceeding found in the Utah Code:

> "Child custody proceeding" means a proceeding in which legal custody, physical custody, or parent-time with respect to a child is an issue. The term includes a proceeding for divorce, separation, neglect, abuse, dependency, guardianship, paternity, termination of parental rights, and protection from domestic violence, in which the issue may appear.

*Id.* § 78B-13-102(4).

¶20    From these statutory provisions, Mother argues that the PSS petition filed by DCFS did not indicate that "legal custody" or "physical custody" of the Children was at issue, asserting "the PSS petition was arguably not a 'child *custody* proceeding' for purposes" of the UCCJEA. Mother further argues that because the Children had been in Texas for more than six months by the time Grandparents petitioned for custody in June and August 2020, "Texas was the 'home state' of the Children under" the UCCJEA and Utah did not have jurisdiction to consider Grandparents' custody petition.

¶21    Mother is mistaken. The statutory language makes it clear that the Utah juvenile court had jurisdiction over the custody petition. Under the plain language of the UCCJEA, Utah was the "home state" of the Children "on the date of the commencement of the proceeding" that determined child custody. *See id.* § 78B-13-201(1)(a) ("[A] court of this state has jurisdiction to make an initial child custody determination only if . . . this state is the home state of the child on the date of the commencement of the proceeding . . . ."). And a "child custody proceeding" includes "a proceeding

in which . . . *parent-time* with respect to a child is an issue." *See id.* § 78B-13-102(4) (emphasis added).

¶22 Here, the "child custody proceeding" commenced when the juvenile court adjudicated the PSS petition. While it is true that the PSS petition—filed in May 2019 when the Children were living in Utah—did not mention legal custody, physical custody, or parent-time, it did recount three incidents of domestic violence, one of which was committed in the presence of the Children, perpetrated by Father. Based on these allegations, DCFS asked the juvenile court to adjudicate the Children "abused, neglected and/or dependent" because they had "suffered non-accidental harm or threatened harm . . . [w]hen [Father] committed domestic violence in the presence of the [C]hildren by hitting [Mother,] causing her a bloody nose, choking her, and knocking her to the ground."

¶23 In adjudicating the PSS petition, the court specifically found that the Children were "abused" by Father in that the Children had "suffered non-accidental harm or threatened harm" when Father "committed domestic violence" in their presence. And, as it was allowed to do given the finding of abuse,[4] the

---

4. A custody determination is implicit in a petition asking a juvenile court for a finding of abuse, which is precisely what DCFS presented here. The statute does not require a talismanic invocation of the words "custody" or "parent-time," because it is presumed that once a finding of abuse is reached, custody or parent-time will naturally be addressed. Indeed, section 80-3-405 states that the "juvenile court may vest custody of an abused, neglected, or dependent minor in [DCFS] or any other appropriate person." *See* Utah Code § 80-3-405(1)–(2).

Moreover, that DCFS did not mention "custody" or "parent-time" in the PSS petition did not deprive the juvenile court of jurisdiction, because the petition is not where the issue

(continued…)

juvenile court also made a "custody" determination—at least according to the terms of the UCCJEA—when it limited Father's parent-time. Specifically, the juvenile court ordered that Father "shall not return to the family home until further order" of the court. And it further specified that "[v]isitation between [Father] and the [C]hildren shall be reasonable and supervised as approved by [DCFS] and the [GAL], until further order of the [c]ourt."

¶24    The Utah juvenile court obtained jurisdiction as soon as it entertained the PSS petition because two conditions were met. First, the PSS petition resulted in a "proceeding for . . . abuse . . . and protection from domestic violence." *Id.* § 78B-13-102(4). Second, in that proceeding, "parent-time with respect to [the Children was] an issue." *Id.* Accordingly, under the terms of the UCCJEA, the PSS petition gave rise to a child custody determination because parent-time—specifically with respect to Father—was "an issue." *Id.* And the juvenile court had jurisdiction from that time on because Utah was the "home state of the [Children] on the date of the commencement" of the PSS petition and resulting proceeding. *See id.* § 78B-13-201(1)(a).

¶25    Once jurisdiction attached at the commencement of proceedings by the filing of the PSS petition, it remained intact. Mother argues the opposite—that while Utah may have had jurisdiction of the initial matters in the PSS petition, jurisdiction switched to Texas for the custody matters related to Grandparents. We rejected a similar argument in *In re A.J.B.*, 2017

---

must arise for a proceeding to become a "[c]hild custody proceeding." *See id.* § 78B-13-102(4). The statute merely says that a child custody proceeding "includes a proceeding for," among other things, "neglect, abuse, dependency," or "protection from domestic violence, in which the issue" of "legal custody, physical custody, or parent-time with respect to a child . . . . may appear." *Id.*

UT App 237, 414 P.3d 552, where we stated that "once a state makes an initial child custody determination, that state obtains exclusive, continuing jurisdiction, which exists until that state relinquishes or is divested of its exclusive jurisdiction in accordance with the UCCJEA or a similar act." *Id.* ¶ 16 (cleaned up). Because the juvenile court never relinquished its jurisdiction over the case here, "whether pursuant to section 207 of the UCCJEA or any other statute," it retained jurisdiction over the Children. *See id.; see also* Utah Code § 78B-13-207(1) ("A court of this state that has jurisdiction under this chapter to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum.").

¶26    In sum, the Utah juvenile court's jurisdiction commenced on the filing of the PSS petition—which alleged abuse, neglect, and dependency due to domestic violence—and resulted in limitations on Father's parent-time. Accordingly, Mother's first claim of error fails.

## II. ICPC Violation

¶27    Mother next contends that the juvenile court also violated the ICPC by failing to ensure that Grandparents were fit for custody before placing the Children with them.[5]

---

5. Grandparents argue that this challenge is unpreserved, an assertion that has some merit. However, "if the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." *State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (cleaned up). "[B]ecause we can easily dispose of" Mother's ICPC claim on its "merits, we choose to exercise our

(continued…)

¶28 The purpose of the ICPC is to ensure that "[e]ach child requiring placement" receives "the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide necessary and desirable care." Utah Code § 80-2-905 art. I(1). The ICPC also allows the "appropriate authorities in a state where a child is to be placed [to] have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child." *Id.* § 80-2-905 art. I(2). Moreover, the ICPC ensures that the "proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before it is made." *Id.* § 80-2-905 art. I(3).

¶29 By its own terms, the ICPC is oriented toward facilitating interstate placements in the context of anticipated adoptions coordinated by state authorities or private agencies, a point that it makes explicitly clear:

> This compact shall not apply to . . . [t]he sending or bringing of a child into a receiving state by [the child's] parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or . . . guardian and leaving the child with any such relative or nonagency guardian in the receiving state.

*Id.* § 80-2-905 art. VIII(1). Thus, the ICPC exempts parents from the requirement of ascertaining the suitability of the placement if the parent is sending the child to one of the identified relatives or guardians.

---

prerogative to simply assume that [it was] preserved and proceed to consideration of the merits." *Id.*

¶30    Here, Mother is the one who sent the Children to stay with Grandparents, a point about which there is no disagreement. Mother sent the Children to live with Grandparents after a criminal episode allegedly committed by Boyfriend in the presence of the Children because she was concerned that her alleged involvement in the incident might lead to the placement of the Children in foster care. Thus, the sending of the Children to live with Grandparents was voluntarily and directly done by Mother while the Children were in her custody. It was only later, after Grandparents petitioned for custody due to Mother's persistent instability and ongoing involvement in relationships plagued by domestic violence, that the juvenile court entered custody orders for Grandparents. And by this time, the Children were physically living in Texas.

¶31    The provisions of the ICPC that work to ensure the suitability of the placement to which a child is sent simply do not apply here because Mother herself sent the Children to live with Grandparents long before they petitioned for custody. Accordingly, Mother's second claim of error fails.

### III. Ineffective Assistance

¶32    Mother's next claim is that she received ineffective assistance when Counsel failed to call her therapist to testify "as to her current mental health status in terms of her ability to parent the Children effectively." Mother argues that having her therapist testify would have shown that "she was actively engaged in and had never stopped working on her mental health issues/concerns," thus allowing the juvenile court "to make better informed decisions" about her parenting abilities.

¶33    Parents are entitled to the effective assistance of counsel in child welfare proceedings. *See In re. E.H.*, 880 P.2d 11, 13 (Utah Ct. App. 1994) (recognizing an implicit guarantee of effective assistance of counsel in a proceeding to terminate the

fundamental right of parenting one's children); *see also* Utah Code § 78B-22-201(1)(b). "To prevail on an ineffective assistance of counsel claim, Mother must show that (1) Counsel's performance was deficient and (2) this deficient performance prejudiced the defense. Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address Mother's claims under either prong." *In re C.M.R.*, 2020 UT App 114, ¶ 19, 473 P.3d 184 (cleaned up). For the deficiency prong, Mother must demonstrate "that, considering the record as a whole, Counsel's performance was objectively unreasonable." *In re R.G.*, 2023 UT App 114, ¶ 16, 537 P.3d 627. "In other words, Mother must show that . . . Counsel rendered a deficient performance in some demonstrable manner, and that Counsel's performance fell below an objective standard of reasonable professional judgment." *In re C.M.R.*, 2020 UT App 114, ¶ 20 (cleaned up).

¶34    Here, Counsel had an easily discernable strategic reason to refrain from calling Mother's therapist to report on her current mental health progress. The record indicates that the juvenile court made findings that Mother had been untruthful throughout the proceedings and was not taking her mental health treatment seriously. Specifically, the court found that Mother (1) had not "internalized her treatment"; (2) was not "truthful with [DCFS], her treatment providers, her parents, or the [c]ourt"; (3) did not disclose domestic violence incidents involving Father; (4) claimed that she "was fully engaging in her individual counseling and being honest with her therapist" while also admitting through her testimony that she was "not fully honest [with her therapist] about the extent of her contact" with Boyfriend; and (5) was "vague" in stating that she did not know if she was present when Boyfriend committed the robbery with the Children in the car. The court also stated that "[b]ecause of [Mother's] dishonesty to the [c]ourt for nearly two years," it had no way of knowing whether Mother was currently in contact with Boyfriend. And it

concluded, "She has continued to violate [c]ourt orders, . . . and she continues to not understand the dangerous situation she puts [the Children] in when bringing people around them with violence and drug use problems."

¶35 Knowing of Mother's serious credibility problems—problems obviously well known to the court—Counsel had a sound strategic reason not to call her current therapist as a witness. Mother's ongoing pattern of lying, not following court orders, and failing to internalize her therapy would have given Counsel little reason to suspect that anything had changed with respect to her behavior. Counsel might well have feared that calling her current therapist would have, at best, done nothing to help Mother's case or, more likely, compounded the honesty concerns that already plagued her.

¶36 Moreover, Counsel would have legitimate concerns about what might be revealed on cross-examination. While limiting exposure of inconsistencies that would exacerbate Mother's credibility issues might be possible on direct examination, Counsel would have no such control over the direction of questioning on cross-examination, where opposing counsel would certainly take the opportunity to highlight Mother's already glaring credibility issues.

¶37 Because Counsel had a strategically reasonable basis for not calling the therapist as a witness, Mother's ineffective assistance claim necessarily fails.

## IV. Burden of Proof

¶38 Mother's final assertion is that the juvenile court applied the incorrect standard for the post-adjudication hearing. More specifically, Mother argues that the court "applied the wrong standard by requiring proof" from Grandparents of what was necessary for the welfare of the children, *see* Utah Code § 78A-6-

357(4)(a), rather than considering the more demanding parental-presumption standard. The parental presumption means that "where one party to [a custody dispute] is a nonparent, there is a presumption in favor of the natural parent, even if an ordinary best-interest inquiry would come out in favor of the nonparent." *In re A.T.*, 2020 UT App 50, ¶ 12, 464 P.3d 173 (cleaned up).

A.      Parental Presumption

¶39    Mother was not entitled to the parental presumption. Our supreme court has expressly stated that "the parental presumption does not apply . . . to cases brought before the juvenile court on abuse, neglect, or dependency petitions. In such cases, the petition alone is sufficient to overcome the parental presumption for purposes of adjudicating the allegations in the petition." *In re K.F.*, 2009 UT 4, ¶ 69, 201 P.3d 985 (cleaned up); *accord In re A.S.A.*, 2012 UT App 151, ¶ 3, 279 P.3d 419. And "in cases in which abuse, neglect, or dependency is established, the usual parental presumption that prevents the State (a nonparent) from intervening in parental decision-making no longer applies, and the State (supervised by the juvenile court) may take custody of children, even over their parents' objections, and place them appropriately." *In re A.T.*, 2020 UT App 50, ¶ 14.

¶40    Here, not only had DCFS filed a petition alleging abuse, neglect, or dependency, but the juvenile court had actually adjudicated the Children as abused. This court long ago observed that "the legislature has determined, as evidenced by the statutory scheme, that in cases involving a petition alleging the abuse, neglect, or dependency of a child, the parental presumption does not apply. . . . The legislature has determined that abuse or neglect of a child at the hands of a parent, or dependency of a child, is incompatible with the *presumption* that the child is best served by being in the parent's custody." *In re J.M.V.*, 958 P.2d 943, 948 (Utah Ct. App. 1998). Since the Children had been so "adjudicated and the court had continuing jurisdiction over them, it was also within

the court's dispositional authority to vest legal custody" in DCFS or in another appropriate person. *See In re S.F.*, 2012 UT App 10, ¶ 44, 268 P.3d 831 (cleaned up); *see also* Utah Code § 80-3-405(1)–(2) ("Upon adjudication . . . , [t]he juvenile court may vest custody of an abused, neglected, or dependent minor in [DCFS] or any other appropriate person . . . ."). Thus, Mother's parental presumption didn't apply because the juvenile court exercised continuing jurisdiction over the Children after the adjudication, which allowed the court "to impose any of the dispositional choices available to it." *See In re M.J.*, 2011 UT App 398, ¶ 56, 266 P.3d 850; *see also In re S.A.*, 2016 UT App 191, ¶ 6, 382 P.3d 642 ("The adjudication of a child as dependent, neglected, or abused forms the basis for juvenile court jurisdiction, thereby making all of the dispositional options . . . available to that court.").

¶41   In sum, after the juvenile court's adjudication pursuant to Mother's entry of a rule 34(e) plea in response to the allegations of abuse, neglect, or dependency contained in the PSS petition, Mother was not entitled to invoke the parental presumption.

B.     Burden of Proof

¶42   Even deprived of the parental presumption, Mother argues that the juvenile court held her "to a higher standard than required under the rules for her to modify a temporary order of custody," thereby shifting the burden to her rather than keeping it with Grandparents. It appears that Mother is arguing that the juvenile court erred not in applying the wrong burden of proof to Grandparents—namely "by clear and convincing evidence"—but that it applied that same standard to her as well. But because Mother was not entitled to the parental presumption, the question becomes what standard of proof the juvenile court should have applied to Mother's petition to modify or restore custody.

¶43   Mother's petition to modify or restore custody was considered along with Grandparents' petition for custody. The

juvenile court recognized that modifications to custodial orders are generally "treated as disposition hearings and subject to the preponderance of the evidence standard." However, because DCFS was no longer a party to this case at this point, the juvenile court determined that it was "more similar to a custody dispute between a parent and non-parent." And given this circumstance, the court concluded that the dispute "should proceed at the clear and convincing standard of proof for all parties."

¶44 It appears that the juvenile court applied the wrong standard of proof to Mother's petition to modify or restore custody. Modifications of an interim order, which was the procedural situation here, are governed by rule 47 of the Utah Rules of Juvenile Procedure. *See* Utah R. Juv. P. 47(b)(2)–(3), (c) (providing the process for modification of prior dispositional orders). And the burden of proof employed in imposing "any of the dispositional choices" available to the juvenile court, *In re M.J.*, 2011 UT App 398, ¶ 56, is the preponderance of the evidence standard, *cf.* Utah R. Juv. P. 41(c) ("[M]atters regarding child custody, support, and visitation certified by the district court to the juvenile court must be proved by a preponderance of the evidence . . . .").

¶45 While Mother may be right that the clear and convincing standard should not have been applied to her petition to modify, she has made no showing that an application of the correct standard of proof—preponderance of the evidence—would have resulted in a better outcome. Thus, any error of the juvenile court as to the standard of proof has not been shown to have prejudiced Mother. *Cf. In re L.B.*, 2015 UT App 21, ¶ 6, 343 P.3d 332 (per curiam) ("Harmless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings." (cleaned up)); *accord In re A.M.*, 2009 UT App 118, ¶ 21, 208 P.3d 1058.

¶46 First, Mother makes no showing that Grandparents failed to demonstrate that it was in the Children's best interest to award them permanent custody and guardianship. Thus, the application of the wrong standard of proof—which was more rigorous in any case—was largely irrelevant to Grandparents' ability to prove their case.

¶47 Moreover, the juvenile court entered extensive factual findings. Based on these findings, the court concluded that Mother had "not changed her circumstances," making it unnecessary to conduct an examination of the Children's best interests with regard to Mother's petition to modify custody. Such an examination was unnecessary because a change of circumstance is necessary to restore custody to a parent whose legal custody has been transferred by the juvenile court. *See* Utah Code § 78A-6-357(3)(b) ("A parent or guardian may only petition the juvenile court [for restoration of custody] on the ground that a change of circumstances has occurred that requires modification or revocation in the best interest of the child or the public."). Mother has not challenged the court's finding that she has not changed her circumstances. Nor has she made any attempt to show how the court's application of a less rigorous burden of proof would have made a difference in its determination that a consideration of the Children's best interests was unnecessary given the lack of the change in circumstances.

¶48 Because Mother has not demonstrated how this alleged error regarding the increased burden of proof prejudiced her, this claim fails.

CONCLUSION

¶49 Mother's challenge to the jurisdiction of the Utah juvenile court fails because the court's jurisdiction commenced with the filing of the PSS petition, which resulted in limitations on Father's

parent-time and the continued jurisdiction of the juvenile court. Mother's claim that the juvenile court violated the ICPC fails because she voluntarily sent the Children to live with Grandparents. Mother's ineffective assistance claim falls short for lack of deficient performance. And the parental presumption was unavailable to Mother owing to the juvenile court's jurisdiction over the Children, so Mother has not demonstrated prejudice on her burden-of-proof claim.

¶50  Affirmed.

———————