**2024 UT App 104**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF B.D.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

N.D.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20230620-CA
Filed August 1, 2024

Third District Juvenile Court, Salt Lake Department
The Honorable David L. Johnson
No. 1224298

Colleen K. Coebergh, Attorney for Appellant

Sean D. Reyes and John M. Peterson,
Attorneys for Appellee

Martha Pierce and Heath R. Haacke,
Guardians ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

HARRIS, Judge:

¶1     In this case, we are asked to determine whether a child's unproven and apparently unsupported allegations of abuse against a parent, coupled with the child's stated desire not to live with that parent, are enough to support a determination that the child is "dependent" as to that parent. On the record before us, we conclude that the facts do not support a dependency adjudication

as to the parent in question, and we therefore reverse the juvenile court's conclusion to the contrary.

## BACKGROUND[1]

*Child's Hospitalization and Abuse Allegations*

¶2     N.D. (Father) and R.D. (Mother) are the natural parents of four children.[2] B.D. (Child)—born in 2008—is the oldest of the four children and was fourteen years old during the events that gave rise to this appeal. Although Father and Mother are still married, they have been separated since March 2020 and now live in different counties. After the separation and until April 2023, Mother was the primary caregiver for the children and Child resided primarily with her.

¶3     In April 2023, Child experienced "depression and suicidal ideations," and on April 11 he took twenty-two over-the-counter pain pills, prompting Mother to rush him to a local emergency room. Later that same day, Mother and Father—together—took Child to Huntsman Mental Health Institute (Huntsman) in Salt Lake City for further treatment and observation.

---

1. "We recite the facts in the light most favorable to the juvenile court findings." *In re J.M.*, 2020 UT App 52, n.1, 463 P.3d 66 (quotation simplified).

2. The parties inform us that R.D. (who now uses the initials A.D.) is Child's biological father but identifies as female, and that Child refers to this parent as "Mom." We are also informed that N.D., Child's biological mother, identifies as male, and that Child refers to this parent as "Dad." In this opinion, in keeping with our understanding of the parties' preferences and usage, we refer to N.D. as "Father" and R.D. as "Mother."

¶4    Two days later, while Child was still at Huntsman, the Department of Child and Family Services (DCFS) received information suggesting that Child had been sexually abused. According to the referral, Child had been abused by both Mother and Father's father (Grandfather); Grandfather had allegedly "touched [Child] inappropriately when [Child] was younger," and Mother had allegedly touched Child inappropriately in "private areas 'below the belt'" on several occasions "until [Child] was about 5 or 6 years old." The next day, a DCFS caseworker spoke with Child, who asserted that Mother had "touched [Child's] private parts inappropriately." Child also indicated that Mother would throw things when she was upset, and Child also described one incident in which Mother "threw a cup" at Child and then hit him "on the mouth." During this interview, Child made no allegations against Father despite being "given opportunities to describe if anyone else did anything" to him.

¶5    On April 27, two weeks after Child's DCFS interview, Child "completed a forensic interview" with a police detective at Huntsman "outside the presence of the parents." During this interview, Child asserted that he had been repeatedly raped by Mother, specifically stating that Mother would take Child's "clothes off and put her 'thing' inside of [Child]."[3] Child then recounted one incident in which Mother raped him in his bed and, while this was happening, Mother's mother "looked in the room and looked at [Child] like [he] was crazy" and then "left and did not do anything about it." During this interview, Child—for the first time—implicated Father in the abuse allegations. Child told the detective that, on one occasion, Father "held down [Child's] arms" while Mother raped him. Child stated that Father "tried to bribe [Child] with chocolate to stop moving," but Child "screamed and called out for help." Before the interview ended,

---

3. Child indicated that this abuse occurred "before [Mother] transitioned to female."

Child indicated that the last time Mother had raped him was "about 8 years" earlier, when Child was in first grade.

¶6      The following day, a DCFS caseworker called Father and informed him of Child's most recent allegations. In response, Father denied that he had ever abused Child, and he "was cooperative in providing names of support individuals and attempting to [create] a safety plan."

¶7      A few days later, on May 1, staff at Huntsman were prepared to discuss discharging Child from their care, but Child "threatened self-harm" if he was "to return home with [Mother]," with whom Child had been living before the hospitalization. Sometime later, Child informed a DCFS caseworker that he "did not want to return home to either [Mother] or [Father]."

*The State's Petition and Shelter Hearing*

¶8      On May 1, the State filed a petition with the juvenile court, recounting Child's abuse allegations and asserting that Child "is an abused, neglected or dependent child." With regard to Father, the petition—as amended—was careful to phrase Child's abuse claims as allegations and not as facts; in particular, the petition stated that Child "alleged [that Father] held down [Child's] arms while [Mother] raped [Child], and that [Father] tried to bribe [Child] with chocolate to stop moving." The petition also stated that Father "denies that he has ever physically or sexually abused" Child. The State requested that DCFS "or an appropriate relative" be given "custody and guardianship" of Child and that the court appoint a guardian ad litem to represent Child. The State later filed an amended petition, requesting that "DCFS or an appropriate relative" also be granted custody of Child's three siblings, who were all under the age of twelve at the time.

¶9      On May 2, the matter came before the juvenile court for a shelter hearing. At that hearing, Father and Mother were each appointed an attorney to represent them, and those attorneys

were present. At this time, Child was still at Huntsman receiving treatment, and the other three children were being cared for by Father's mother (Grandmother). Presumably because Child was still at Huntsman receiving necessary care, Father did not make any request that the court order Child to be discharged from Huntsman and sent home with him; indeed, Father's counsel "submitted as to the shelter findings," including a finding that removal of all four children from their parents' custody was "reasonable in that there is a serious danger to the physical health or safety of the children and [that] the children cannot be protected without removal from the custody of [Father]." At the conclusion of the hearing, the court found that removal was in the best interest of the children and ordered all of them to be "placed in the custody of" DCFS. But none of the children was moved to a different place: the younger children remained with Grandmother, and Child remained at Huntsman.

¶10     After a failed mediation, Father filed a notice demanding that an adjudication trial be scheduled "on or before July 1, 2023," which was sixty days after the shelter hearing. Mother objected to any expedited trial schedule and, instead, asked that her trial schedule be "bifurcated" from Father's. The court granted Mother's request and, since then, the matters pertaining to each parent have proceeded separately; only Father's adjudication is at issue in this appeal.

¶11     On June 8, Child was discharged from Huntsman and was temporarily placed at a short-term emergency children's shelter while he waited for a more permanent placement. The record submitted to us is unclear whether Father was allowed to, or did, visit with Child while he was in the short-term shelter. But during this time, Father made "consistent" weekly supervised visits with the younger children and was "engaged" during the visits; he also "attended every Child and Family Team meeting[] and . . . asked questions and interacted during the meetings." At some point in June, the three younger children were placed with Father (instead of Grandmother), and DCFS noted that "[t]he parents have the

resources and knowledge to meet all of the children's needs and they are able to keep them safe." Soon thereafter, the State moved to dismiss the petition as to the three younger children, and the court granted this motion. The court specifically indicated that it was terminating its "temporary and preliminary jurisdiction" over the younger children, leaving only the State's allegations regarding Child for further proceedings.

*Father's Adjudication*

¶12 On June 27, the juvenile court held a hearing to consider and adjudicate the State's allegations, as to Father, regarding Child. The court began the hearing by engaging in a colloquy with Father about his rights and, in particular, what the implications would be if he were to admit—or not contest—the facts as alleged in the State's petition. During this discussion, the court informed Father that if he were to "admit" or "answer to the allegations in the petition"—the latter presumably a reference to a no-contest response pursuant to rule 34(e) of the Utah Rules of Juvenile Procedure[4]—then the court could have "jurisdiction or authority over" Father and Child and "could enter orders" regarding Child that potentially involve "parental rights." In response, Father acknowledged that he understood.

¶13 Once the juvenile court had finished with its colloquy, it then asked Father how he would "like to answer" the petition. Father decided not to contest any of the facts alleged in the State's petition; instead, he admitted the allegations contained in twelve paragraphs, and he entered a "rule 34(e) response" to the allegations in the remaining paragraphs. Those facts have been described earlier in this opinion. *See supra* ¶¶ 3–7. But he argued

_____

4. Under rule 34(e) of the Utah Rules of Juvenile Procedure, "[a] respondent may answer by admitting or denying the specific allegations of the petition, or by declining to admit or deny the allegations. Allegations not specifically denied by a respondent shall be deemed true." Utah R. Juv. P. 34(e).

that the (now-uncontested) facts alleged in the State's petition did not add up to "dependency," as that term is statutorily defined.

¶14 Father acknowledged that Child had made allegations of abuse against him, but he noted that the State's petition simply stated that allegations had been made and did not directly allege that he had abused Child, and he pointed out that no finding had yet been made as to the veracity of those allegations. Indeed, one of the twelve paragraphs in the State's petition whose allegations Father admitted stated that Father "denies that he has ever physically or sexually abused" Child, and that Father "agrees that [Child] needs ongoing psychiatric care." At the hearing, Father's counsel acknowledged that "services" are needed and indicated that Father agreed with the State that Child "needs care, . . . including mental health care." But counsel noted that the fact that Child needed special mental health treatment "doesn't necessarily mean that there's anything wrong with the parents or that the State needs to step in." Indeed, counsel emphasized that Father had been "active" and "involved" in getting Child the necessary care, including assisting in the Huntsman admission, and asserted that Father remained ready, willing, and able to provide the care Child needed. Father's counsel therefore requested that the court enter a "no finding" as to Father—meaning that Child was not abused, neglected, or dependent as to Father. Counsel then further emphasized that entering "a no finding" would not necessarily be the end of juvenile court proceedings related to Child because Mother "still ha[d] yet to be adjudicated," and Father anticipated that there would "be a finding related to her."[5]

¶15 In response, the appointed guardian ad litem (the GAL) asked for a dependency adjudication, and referenced the admitted allegations contained in one particular paragraph of the State's amended petition: that Child had "threatened self-harm if

_____

5. While not relevant to this appeal, we note that an adjudication order was eventually entered pertaining to Mother wherein the juvenile court found Child "dependent as to [Mother]."

he [was] to return home with [Mother]" and that Child "later told the caseworker he did not want to return home to either [Mother] or [Father]." In particular, the GAL argued that the fact that Child "does not want to return home" to either parent results in a situation "that falls within the dependency finding that [Father] is not capable . . . of caring for [Child] at this time."

¶16    For its part, the State responded by asserting that, if the court "were to make a 'no finding,'" then Child "would be returned to [Father's] care immediately." The State did not assert that Father was "at fault," and it even acknowledged that Father had been "cooperative" and "helpful" throughout the process, but it nevertheless argued that "we're in this unique situation where . . . we're all in agreement that [Child] needs that ongoing care," and that "if there's a 'no finding,' [DCFS] would be forced to return [Child] to [Father's] care immediately." The State concluded by stating that Child "cannot return safely to [Father's] care where [there are] threats of self harm," and by asserting that "if [Child] were to return" to Father's care, then Child "would be in a worse mental state." Notably, neither the State nor the GAL asked the juvenile court to make a dependency finding on the basis of any statement Father made or action Father took at either the shelter hearing or the adjudication hearing.

¶17    In rebuttal, Father asserted that "the State's argument would result in a dependency finding every single time a child says 'I don't want to go home.'" At no point during the hearing did the State or the GAL argue that the juvenile court was somehow restricted from entering a "no finding" as to Father, nor did they argue that a "no finding" as to Father would result in the dismissal of the case as to Mother or in the complete loss of jurisdiction over the case. At the conclusion of the hearing, the juvenile court took the matter under advisement.

¶18    A few days later, the court issued two written rulings: one prepared with the assistance of counsel that contained the court's findings of fact, all of which were taken directly from the

uncontested facts alleged in the State's petition; and the other apparently prepared by the court, on its own, that contained the court's legal reasoning regarding whether the uncontested facts amounted to dependency. In the legal ruling, the court concluded that Child was dependent as to Father. The court noted that it had "not found [Child's] sexual abuse allegations to be true"; indeed, it stated that, "for reasons yet to be known," Child had "felt it necessary to allege" that Mother, Father, and Grandfather had "subjected [Child] to sexual abuse."[6] But the court found that Child's allegations—even if untrue—had "led to a fundamental breakdown in this family unit," and it noted that Child "has refused to return to the family home and has threatened self-harm if forced to return." The court "share[d]" Father's concerns that a dependency finding in this situation might "lead the way for any child who refuses to go home [to be considered] a 'dependent child,'" but in the court's view this case presented more than "simply a disagreement between a young teenager and [his] parents." The court acknowledged that Father "asserts [that] he can take care of [Child's] needs," but nevertheless identified two facts that it believed differentiated this situation from one involving a mere "standoff between children and their parents": (1) Child had "an ongoing need for psychiatric care," and (2) Child "continues to threaten self-harm." In the court's view, these two facts "create a situation where it would be unsafe—at least for now—to reunite this family." Notably, the court did not ground its dependency determination in any statement Father made or action Father took at either the shelter or adjudication hearing.

¶19 Ultimately, the court concluded that Child "is a dependent child . . . , in that [Child] lacks proper care through no fault of [Father]." The court noted that Child "needs ongoing mental health treatment and support," and stated that "the allegations

---

6. It is unclear from the record what the basis was for the juvenile court's statement that it had "not found" Child's allegations of sexual abuse to be true.

levied by [Child]—while not found to be true—present a barrier to a safe and harmonious reintegration into the family unit."

ISSUES AND STANDARDS OF REVIEW

¶20 Father now appeals the juvenile court's dependency adjudication, and he asserts that the uncontested facts do not amount to dependency. "When the facts are stipulated, we review the conclusions drawn by the juvenile court for correctness." *In re K.T.*, 2023 UT App 5, ¶ 7, 524 P.3d 1003 (quotation simplified), *cert. denied*, 528 P.3d 327 (Utah 2023).

¶21 In addition to contesting Father's arguments on their merits, the State and the GAL contend that there are alternative grounds upon which we can affirm the adjudication order. They argue that Father is precluded from challenging the dependency adjudication because, at various hearings in the juvenile court, he "conceded the need for juvenile court jurisdiction over [Child]" and because he "waived or conceded claims and even invited error at the trial level." "[I]n determining whether the juvenile court had subject matter jurisdiction" over a case, we "apply a correction of error standard, giving no deference to the juvenile court." *In re K.F.*, 2009 UT 4, ¶ 18, 201 P.3d 985. A determination about whether there was a waiver on Father's part "presents a mixed question of law and fact." *Mower v. Nibley*, 2016 UT App 174, ¶ 11, 382 P.3d 614. We review whether a court "employed the proper standard of waiver" for correctness, "but the actions or events allegedly supporting waiver" are reviewed deferentially. *Id.* (quotation simplified).

ANALYSIS

¶22 We begin our analysis by addressing the arguments raised by the State and the GAL that Father's appellate claims are barred as a result of his actions at the shelter hearing and the adjudication

hearing. Because we determine that Father's claims are not barred, we then turn to the merits of his challenge to the juvenile court's adjudication order.

## I. Preliminary Issues

¶23   As we understand them, the preliminary arguments presented by the State and the GAL are based on several factual premises. First, they note that, at the shelter hearing, Father submitted to the juvenile court's shelter findings, for purposes of that hearing, and did not request that he be given immediate custody of Child. Second, the State notes that, at the outset of the adjudication hearing, the juvenile court informed Father that, if he "admit[ted]" or "answer[ed] to the allegations in the petition," that would "give the [c]ourt jurisdiction" over Child. And third, the State and the GAL point to Father's acknowledgment, made at the adjudication hearing, that Child requires ongoing "services." From these factual premises, the State and the GAL make various jurisdiction- and waiver-related arguments. In particular, the State and the GAL contend that Father, by "submitt[ing] himself to juvenile court jurisdiction and to [DCFS] supervision," has at least implicitly conceded that Child was a dependent child within the juvenile court's jurisdiction. In addition, the GAL asserts that by not arguing for immediate custody early on, Father "waived or conceded claims and even invited error at the trial level." Based on these arguments, the State and the GAL ask us to affirm the juvenile court's adjudication order without reaching the merits of Father's appeal. We find the proffered arguments unpersuasive, on this record, and we therefore decline that invitation.

### A Jurisdictional Arguments

¶24   Juvenile courts have original and exclusive jurisdiction over proceedings that involve a child who is abused, neglected, or dependent. Utah Code § 78A-6-103(2)(a)(i); *see also In re K.F.*, 2009 UT 4, ¶ 22, 201 P.3d 985. Ordinarily, parents enjoy a "parental

presumption" to make decisions for their children and "to prevent the transfer of [their children's] custody to a nonparent," including the State. *See In re K.F.*, 2009 UT 4, ¶ 66 (quotation simplified). But "[i]n cases in which abuse, neglect, or dependency is established, the usual parental presumption that prevents the State (a nonparent) from intervening in parental decision-making no longer applies, and the State (supervised by the juvenile court) may take custody of children, even over their parents' objections, and place them appropriately." *In re A.T.*, 2020 UT App 50, ¶ 14, 464 P.3d 173. Thus, it is well-established that, after a determination has been made—by clear and convincing evidence at the adjudication phase of juvenile court proceedings—that a child is abused, neglected, or dependent, the juvenile court has jurisdiction over that child and may make decisions regarding that child, even over a parent's objection.

¶25 But even before adjudication—and based solely on the filing of a petition alleging abuse, neglect, or dependency—a juvenile court has limited and temporary jurisdiction over the child "for purposes of adjudicating the allegations in the petition." *See In re K.F.*, 2009 UT 4, ¶ 69 ("[T]he petition alone is sufficient to overcome the parental presumption for purposes of adjudicating the allegations in the petition."); *see also In re R.D.*, 2024 UT App 91, ¶ 26 (stating that the "juvenile court's jurisdiction commenced on the filing of the [State's] petition—which alleged abuse, neglect, and dependency"). Thus, the source of a juvenile court's jurisdiction over a child, during the period between the filing of a petition and the court's eventual adjudication determination, is simply the fact that a petition has been filed alleging abuse, neglect, or dependency.

¶26 During this interim pre-adjudication period, the juvenile court may—and in many cases must—hold a hearing to consider whether orders regarding the temporary custody of the child should be made. *See* Utah Code § 80-3-203(2) (requiring in certain situations the scheduling of an "expedited hearing," held after the filing of "an abuse, neglect, or dependency petition," to consider

"whether a child should be placed in temporary custody"); *see id.* § 80-3-301(1) (requiring a juvenile court to "hold a shelter hearing to determine the temporary custody of a child" if certain conditions are met, including in cases where the child has already been "remov[ed] . . . from the child's home by" DCFS); *see also In re M.V.*, 937 P.2d 1049, 1050 (Utah 1997) (stating that "the shelter hearing order is a temporary order entered pending adjudication of the factual allegations of the petition"). Because at the time these pre-adjudication shelter or temporary custody hearings are held there is (by definition) a pending petition alleging abuse, neglect, or dependency, the juvenile court has jurisdiction over the child for the purpose of making temporary custody orders, and the court may make such orders even over a parent's objection. *See* Utah Code §§ 80-3-203(1), -302. At such hearings, the juvenile court's custody or removal decisions (excepting, of course, decisions to dismiss a pending petition) do not carry jurisdictional implications, because jurisdiction over the child exists—at that point in the proceedings—merely by virtue of the existence of the not-yet-adjudicated petition, and does not depend on the specific outcome of the custody or removal determination.

¶27     In this case, the State filed a petition on May 1 alleging that Child was abused, neglected, or dependent. The very next day, the juvenile court held a shelter hearing. At that point, the court's jurisdiction over Child—as well as the other three children—was based on the existence of the State's petition. Thus, short of making some argument for dismissal of the petition at the shelter stage—something neither the State nor the GAL asserts Father was obligated to do in this case—there was nothing Father could have said or done during the shelter hearing to challenge the court's jurisdiction over Child.

¶28     And while it is possible for a parent to make factual or legal admissions, in the context of a shelter hearing, that could constitute a concession to ongoing juvenile court jurisdiction over a child throughout a case, that did not happen here. At the time of the shelter hearing, Child was still at Huntsman, receiving care

that Father had helped Child obtain and that Father continued to believe was necessary. Moreover, the hearing occurred just one day after the State's petition was filed, and it was the very hearing at which Father was appointed counsel for the first time. In context, then, Father's decision not to challenge Child's current placement is understandable, and we are therefore not as eager as the State and the GAL are to hold Father's shelter hearing position—that Child should remain at Huntsman rather than be placed with him in his home—against him now.

¶29   Nor do we think Father's decision not to contest the specific shelter findings entered here constituted a concession that the juvenile court had ongoing jurisdiction over Child throughout the entire case. Certainly, none of the shelter hearing findings necessarily indicated that abuse, neglect, or dependency had occurred at all, let alone as to Father (as differentiated from Mother). To be sure, Father did elect not to contest the finding that removal of the children from his and Mother's custody was "reasonable" because there existed "a serious danger to the physical health or safety of the children." But this finding carried no jurisdictional implications, both because (a) as already noted, jurisdiction—at that stage—was based on the filing of the State's as-yet-unadjudicated petition, and jurisdiction (if any) following adjudication would be based on the findings made at an eventual adjudication hearing, and (b) that specific finding, in the context of this case, was not equivalent to a finding of abuse, neglect, or dependency as to Father, let alone one that was necessarily made for purposes not just of that hearing but for all subsequent ones.

¶30   Finally, we find unpersuasive the State's assertion that Father effectively conceded juvenile court jurisdiction over Child at the adjudication hearing by (a) admitting that Child needed "services" or (b) electing not to contest the facts as alleged in the State's petition. As to the State's first point, we simply read the record differently than the State does. Notably, just three sentences after stating that it was "clear" that Child needed "services," Father's counsel stated that "many children do need

care of all kinds, including mental health care," and that the mere fact that a child needs such care "doesn't necessarily mean that there's anything wrong with the parents or that the State needs to step in." In context, then, Father's statement that Child needed "services" was simply an acknowledgment that Child needed ongoing and continuing mental health treatment. We do not view this statement as a concession that Child needed ongoing services *from the State*, or as a concession to ongoing juvenile court jurisdiction over Child.

¶31    As to the State's second point, it is certainly true that, in many cases—for instance, where the State's petition contains a direct allegation of abuse, neglect, or dependency—a decision not to contest the factual assertions set forth in the State's petition might have the effect of conceding juvenile court jurisdiction over a child. But here, as already noted, the State phrased its allegations carefully, and did not directly allege abuse, neglect, or dependency; instead, it asserted that Child "alleged [that Father] held down [Child's] arms while [Mother] raped [Child], and that [Father] tried to bribe [Child] with chocolate to stop moving." Father entered a rule 34(e) response to this specific paragraph, and thereby did not contest that Child had made those allegations. But a decision not to contest the fact that allegations were made is not equivalent to an admission that the allegations are true. Indeed, Father's position at the adjudication hearing was that the uncontested facts simply did not amount to dependency as a matter of law. Under these circumstances, Father's acknowledgment during the juvenile court's colloquy with him at the adjudication hearing—that failure to contest facts could result in the court being able to enter orders regarding Child—was not inconsistent with this position and did not constitute a concession that the court had continuing jurisdiction over Child.

¶32    Accordingly, we reject the argument, advanced by the State and the GAL, that Father—through his actions during hearings in the juvenile court—conceded that Child was and

would be subject to the continuing jurisdiction of the juvenile court throughout the pendency of the entire case.

### B. Waiver Arguments

¶33 Next, we address the GAL's argument that Father "waived or conceded claims and even invited error at the trial level." According to the GAL, when Father submitted to the shelter findings, he "resisted providing proper parental care" and therefore "conceded" or "waived" his right to argue, at the adjudication hearing, that Child was not dependent as to Father.

¶34 As we understand this argument, it is grounded in the common law doctrine of waiver, and in that context, our supreme court has made clear that "waiver" is "the intentional relinquishment of a known right." *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 939–40 (Utah 1993) (quotation simplified). There are "three elements" to waiver: "(1) an existing right, benefit, or advantage; (2) knowledge of its existence; and (3) an intention to relinquish the right." *Id.* at 940. The question of whether "intentional relinquishment" was demonstrated is a "legal question" that "is intensely fact dependent," *id.*, and "the legal conclusions underlying" a trial court's waiver determination, even one made on summary judgment, "are reviewed with some measure of deference," *IHC Health Services, Inc. v. D & K Mgmt., Inc.*, 2003 UT 5, ¶ 6, 73 P.3d 320.

¶35 But no party raised a waiver argument before the juvenile court at any point; that is, neither the State nor the GAL argued that the court should find Child dependent as to Father based on the actions (or inactions) Father took at either the shelter hearing or the adjudication hearing. There are thus no findings addressing whether Father ever intentionally relinquished a known right. And as we read the record, it is far from clear that Father—by his actions at the hearings—intended to relinquish his right to contest the State's assertion that Child was dependent. While this court "may affirm a judgment on an unpreserved alternate ground," we

may only do so "where the alternate ground is apparent on the record and when the facts as found by the trial court are sufficient to sustain the decision of the trial court on the alternate ground." *Angel Invs., LLC v. Garrity*, 2009 UT 40, ¶ 38, 216 P.3d 944 (quotation simplified). On this record, the merit of the GAL's waiver-based alternative argument is far from clear.[7] We therefore decline to exercise our discretion to affirm the juvenile court's adjudication order on this alternative basis.

¶36 We also reject the GAL's argument, made in passing, that Father "invited error at the trial level." "The invited-error doctrine precludes a party from taking advantage of an error committed at trial when that party led the trial court into committing the error." *ConocoPhillips Co. v. Utah Dep't of Transp.*, 2017 UT App 68, ¶ 20, 397 P.3d 772. But it is unclear from the GAL's briefing what the "error" was, exactly, that Father invited the court to commit. For the reasons already explained, it wasn't error for the court to assume jurisdiction over the proceeding and, for purposes of the shelter hearing, over Child simply based on the existence of the State's petition. No party assigns error to any of the findings the court entered at the shelter hearing; instead, Father simply asserts the right to take a different position as to custody and removal at

---

7. In this vein, we note that the GAL has not pointed us to anything in statute, rule, or case law that supports the proposition that the position a party takes at a shelter hearing might adversely impact that party's ability to take a different position later, in advance of a future adjudication hearing. This is certainly not true for the State—and wasn't in this case with regard to the three younger children, whom the State agreed to return to Father's custody after the shelter hearing—and because of the nature of shelter hearings, there exist sound reasons why parents should not always and irrevocably be held to the positions they take at a shelter hearing with regard to the propriety of removal. But we need not consider these issues further in this case, because we decline to exercise our discretion to affirm on this alternate basis.

the adjudication hearing than he took at the shelter hearing. And—as discussed below, *see infra* ¶ 45 & n.12—the juvenile court did not rest its dependency determination on anything Father said or did at either of the hearings. Accordingly, we find the GAL's invited-error argument inapposite here.

¶37     In summary, the State and the GAL have not persuaded us that we can affirm the juvenile court's adjudication order as to Father on any of the alternative grounds they identify.[8] We therefore decline their invitation to affirm on an alternative basis, and we now turn to the merits of Father's appellate arguments.[9]

---

8. During oral argument before this court, the GAL also took the position that the juvenile court could not have entered a "no finding" because that concept is a "legal fiction," and both the State and the GAL conveyed their belief that if the court had not found Child dependent at Father's adjudication hearing, then the State's petition would have had to be dismissed in its entirety, including the portions about Mother (whose adjudication hearing had not yet been held). These arguments, however, were not presented to the juvenile court, and the first time that they were raised on appeal was during oral argument. Not only do we decline to consider arguments that were first raised during oral argument, *see Porenta v. Porenta*, 2017 UT 78, ¶ 33, 416 P.3d 487, but we are also unable to affirm on the strength of this alternative argument because its merit is not apparent from the record, *see Angel Invs., LLC v. Garrity*, 2009 UT 40, ¶ 38, 216 P.3d 944.

9. We acknowledge an additional procedural argument raised by the GAL, namely, that Father "has not demonstrated preservation per [r]ule 24(a)(5)" of the Utah Rules of Appellate Procedure. The GAL points out that Father's brief uses the phrase "preserved by appeal" to demonstrate preservation for each issue, but that rule 24(a)(5) mandates that the appealing party also include a "citation to the record," *see id.*, which Father did not do in the preservation

(continued…)

## II. Dependency

¶38 Father's primary argument on appeal is that the uncontested facts, as set out in the State's petition, do not constitute "dependency," as that term is statutorily defined. We find merit in Father's argument.

¶39 Under Utah law, a "[d]ependent child" is defined as "a child who is without proper care through no fault of the child's parent, guardian, or custodian." Utah Code § 80-1-102(21). Thus, unlike abuse or neglect—which both, by definition, involve some fault or failing on the part of the affected parent—dependency can occur even when no parent or guardian has done anything worthy of being called "fault." *See In re A.T.*, 2020 UT App 50, ¶ 16, 464 P.3d 173 (stating that the no-fault aspect of the definition of "dependent child" makes a dependency finding "significantly different from a finding of abuse or neglect").

¶40 The juvenile court correctly recognized that Utah's statutory definition of dependency contains two parts: (1) the child in question must be "without proper care," and (2) that status must have arisen "through no fault of" the parent. *See* Utah Code § 80-1-102(21). In this case, all parties—including the State and the GAL—agree that (in the absence of any finding by the juvenile court that Child's sexual abuse allegations are true) Father is not at fault for Child's situation, and we therefore assume, for purposes of our analysis, that Father is indeed not at

---

part of the statement of the issues set forth in his brief. But the rest of Father's brief—including the section containing the factual recitation and procedural history—contains plenty of citations to the record, and upon review of those citations it is obvious that Father preserved his main appellate argument—that the stipulated facts do not support a dependency finding—for our review. We therefore decline the GAL's invitation to affirm the juvenile court's adjudication order on the basis of these asserted briefing deficiencies on Father's part.

fault. Under these circumstances, then, the relevant question is whether Child is "without proper care."

¶41 As the juvenile court correctly observed, there is "a dearth of guiding case law" interpreting either the general statutory definition of "dependent child" or the specific phrase "without proper care."[10] But as we understand it, the term "dependent" is

___

10. In its ruling, the juvenile court cited and relied on Judge Thorne's dissenting opinion in *In re A.W.*, 2002 UT App 159, 48 P.3d 257. The court's opinion in that case took the form of a memorandum decision in which the majority determined that the juvenile court erred in making a dependency finding because the State never actually argued, in the juvenile court, that the child was dependent, and therefore the parents hadn't had a chance to rebut any such argument. *Id.* ¶¶ 1–2. The majority's decision was very brief, consisting of just five paragraphs, and does not include any recitation of the relevant facts. *See id.* ¶¶ 1–5. In dissent, Judge Thorne opined that "the State presented sufficient evidence . . . to support a finding of dependency" and that the parents had "adequate notice [of] and an opportunity to respond to the facts" that supported such a finding. *Id.* ¶ 9 (Thorne, J., dissenting). In one paragraph, Judge Thorne recited some of those facts, including that the child—a seventeen-year-old—had alleged physical abuse by her father and had threatened to run away if forced to return to the family home, but that the juvenile court had not found sufficient "evidence to determine whether abuse had occurred." *Id.* ¶¶ 7, 10. In Judge Thorne's view, these facts resulted in "a fundamental breakdown in [the] family unit" and raised a danger that the child would run away and become "a homeless child without the proper care of a parent or guardian." *Id.* ¶¶ 10–11. But neither Judge Thorne nor the majority recited any facts about the extent to which the parents—despite the abuse allegations—remained ready, willing, and able to provide proper care for the child or what that care might entail. And the majority

(continued…)

usually used to connote a child who—for reasons that do not involve parental abuse or neglect—is nevertheless "dependent upon the public for support." *See* 43 C.J.S. *Infants* § 18 (2024) (stating that a "dependent child" is one "who must be supported by a person or persons other than his or her natural guardian as where a child is dependent upon the public for support"). As a general matter, children are considered "dependent" if their parents or guardians "are unable" to provide "adequate care and supervision," *see* 47 Am. Jur. 2d *Juvenile Courts, Etc.* § 47 (2024), and for that reason they must depend on the State to provide the necessary care. A child may, of course, become reliant on State-based aid due to abuse or neglect, but the definition of "dependency"—as distinguished from "abuse" or "neglect"—seems intended to capture situations in which a child develops a need for State-based aid due to reasons unconnected to the fault of any parent or guardian. *See id.* ("[A] dependency adjudication focuses not on the fault of the parents, but on the child's environment, including the condition of the home itself and the availability of necessities.").

¶42 The phrase "without proper care" comes unaccompanied by further statutory definition and, to our knowledge, there exists no Utah case law interpreting this phrase in the dependency context. On its face, the phrase "proper care" is "vague and conducive to a variety of reasonable interpretations." *See In re A.B.*, 2022 UT 39, ¶¶ 29, 41, 523 P.3d 168 (interpreting the similar phrase "lack of proper parental care" found in Utah's statutory

---

resolved the matter, as noted, on procedural grounds without reaching the merits of the dependency question. *See id.* ¶¶ 1–5 (majority opinion). For these reasons, we find *In re A.W.* to be of limited assistance in resolving this appeal or in interpreting the statutory definition of "dependent child" under Utah law.

definition of "neglect").[11] For instance, it is not clear from the face of the statute whether the phrase refers "to any parental conduct that falls short of ideal," or whether it refers "only to parental conduct that causes a child to lack basic necessities." *Id.* ¶ 41.

¶43 But we have recently noted—in the neglect context—that the phrase "proper care" must "naturally incorporate notions of reasonableness." *See In re A.S.*, 2024 UT App 52, ¶¶ 31–32, 548 P.3d 181, *petition for cert. filed*, June 11, 2024 (No. 20240626). This makes just as much sense in the dependency context as it does in the neglect context. Indeed, incorporation of reasonableness concepts into the statutory definition of "proper care" aligns with courts' and commentators' reliance on community standards in the dependency context, *see* 47 Am. Jur. 2d *Juvenile Courts, Etc.* § 47 (2024) ("Proper parental care means the minimum standards of care which the community will tolerate."), and it allows for the individual child's situation and needs to be taken into account, *cf., e.g., In re H.F.*, 2019 UT App 204, ¶ 14, 455 P.3d 1098 ("The best interest test is broad, and is intended as a holistic examination of all the relevant circumstances that might affect a child's situation." (quotation simplified)). Thus, we interpret "proper care," in the dependency context, to mean the level of care and attention that the child reasonably needs under the circumstances.

---

11. The only material difference between the phrase used in the statutory definition of neglect ("lack of proper parental care") and the phrase used in the statutory definition of dependency ("without proper care") is the neglect provision's inclusion of the term "parental." *Compare* Utah Code § 80-1-102(58)(a)(ii), *with id.* § 80-1-102(21). The exclusion of the term "parental" from the dependency definition allows for the possibility that dependency may occur in situations where no parent exists at all, such as where a child is homeless or abandoned. But the words "proper" and "care" are common to both definitions, and we thus draw guidance, in this dependency case, from Utah courts' previous decisions interpreting those words in the neglect context.

¶44 Putting these pieces together, then, we conclude that a child is "without proper care," and therefore "dependent," where that child has no parent or guardian at all or where the child's parent or guardian—through no fault of their own—is unable to provide the level of care and attention that the child reasonably needs under the circumstances.

¶45 In the case before us, the juvenile court noted that Father "asserts [that] he can take care of [Child's] needs," and it acknowledged—in its separate findings—that Father was involved in and supportive of admitting Child to Huntsman for necessary psychiatric care; indeed, the court specifically found that Father "agrees that [Child] needs ongoing psychiatric care." But despite these findings, the court nevertheless concluded, based on the uncontested facts, that Child was a "dependent child" within the meaning of the relevant statute. The court concluded that Child's allegations of abuse, including those that related to Father, "have led to a fundamental breakdown in this family unit." In its dependency ruling, the court stated that Child had "refused to return to the family home and ha[d] threatened self-harm if forced to return," but in its separate findings the court stated matters less broadly, finding that Child "threatened self-harm if he is to return home *with* [*Mother*]" (emphasis added), and that Child told a DCFS caseworker that he "did not want to return home to either [Mother] or [Father]."[12]

---

12. It is important here to again point out that the juvenile court's dependency finding was in no way based on anything Father said or did at the shelter hearing or the adjudication hearing. Had Father—by acknowledging that Child needs ongoing mental health treatment and "services"—really been making a concession that Child needed ongoing care from the State that Father was incapable of providing, that concession would indeed have formed a basis, by itself, for a finding of dependency. But the juvenile court didn't interpret Father's comments that way,

(continued…)

¶46    In its dependency ruling, the court acknowledged Father's argument that reaching a "dependency" conclusion in this situation might "lead the way for any child who refuses to go home [to be] a 'dependent child,'" but the court nevertheless concluded that Child was a "dependent child," offering two bases upon which it believed this case could be distinguished from a simple "standoff between children and their parents." First, the court stated that Child "has an ongoing need for psychiatric care." And second, the court noted that Child "continues to threaten self-harm." Father asserts that these two factors are insufficient, on this record, to constitute dependency. We agree with Father.

¶47    With regard to the first factor upon which the juvenile court relied, all parties agree—and the court appropriately found—that Child needs ongoing psychiatric care. But not all children who need ongoing psychiatric care—or, for that matter, any sort of special or extraordinary care—are "dependent" children; the relevant question, as to dependency, isn't whether a child needs a particular type of care, but rather whether the parent stands ready, willing, and able to provide the necessary care. And on this record, there is no indication that Father is unable to provide—or capably arrange for the provision of—the ongoing psychiatric care Child needs.

¶48    Father (with Mother) recognized, after the overmedication incident, that Child had a need for psychiatric care, and Father participated in transporting Child to Huntsman to obtain that care. Indeed, at all stages of this case, Father has been supportive of Child's need for ongoing psychiatric care, and the State even acknowledged—at the adjudication hearing—that Father had been "cooperative" and "helpful" throughout the process.

---

because it based its dependency determination on entirely different grounds. As already noted, *see supra* ¶ 30, we agree with the court's interpretation of the record; that is, we likewise do not view any of Father's statements or actions at the hearings as a concession that Child was dependent on the State for future care.

Moreover, as noted, the court found, in its ruling, that Father "agrees that [Child] needs ongoing psychiatric care."[13] We therefore agree with Father that Child's ongoing need for such care does not necessarily mean that Child is "dependent." In order for Child's care needs to become relevant to the dependency inquiry, there would have to be some evidence that Father is unable to meet those needs, thus leaving Child "without proper care" for purposes of the dependency statute. And on this record, there is no such evidence, let alone a specific finding to that effect.

¶49    With regard to the juvenile court's second factor, we begin by acknowledging that a child's threats of self-harm should be given serious consideration by everyone in the child welfare system, including the juvenile court, and the court here treated those threats with appropriate gravity. Where a child credibly threatens self-harm if they are returned to the custody of a particular parent, that may—in appropriate cases—contribute to a determination that the parent in question cannot provide "proper care" to the child.

¶50    But here, the juvenile court's findings regarding self-harm—drawn from the uncontested facts alleged in the State's petition—were quite specifically limited to the situation in which Child would be returned to *Mother's* custody. The State's petition, as amended, asserts that Child "threatened self-harm if he is to return home *with* [*Mother*]." (Emphasis added.) Father did not contest that allegation, and the juvenile court made a finding in keeping with it, specifically finding that Child "threatened self-harm if he is to return home *with* [*Mother*]." (Emphasis added.) We note, again, that Father and Mother have not resided together since 2020, and the court's reference to "return[ing] home with

---

13. This stands in apparent contrast to the juvenile court's finding regarding Mother. Although the wording is not entirely clear, the court appears to have found that Mother "is unable to care for [Child's] mental health needs at this time." The court made no such finding as to Father.

[Mother]" can only be a reference, on these facts, to a placement with Mother and not a placement with Father.[14] On this record, there is not even any allegation, let alone a judicial finding, that Child had ever threatened self-harm if he were to be placed in Father's custody. We therefore agree with Father that the court's findings about self-harm simply do not support the conclusion that Father—as differentiated from Mother—is unable to provide proper care to Child.

¶51   To be sure, the juvenile court did find that Child "told [a DCFS] caseworker [that] he did not want to return home to either [Mother] or [Father]." But a child's stated desire not to live with a parent is not, by itself, necessarily an indication that the child is "without proper care." Drawing that conclusion would lead us perilously close to the situation of which the court was wisely wary, namely, the situation in which "any child who refuses to go home" would be considered a "dependent child." In order for a child's stated desire not to live with a parent to be relevant to a dependency inquiry, there must be evidence linking the child's desire to an inability, on the parent's part, to provide the care that the child reasonably needs under the circumstances. And in this case, the juvenile court made no findings linking Child's stated desire to any inability, on Father's part, to care for Child.

---

14. For this reason, we are somewhat confused by the court's reference to a "family home" and by the court's statement that Child's allegations had "led to a fundamental breakdown in this family unit." In this case, there had been no "family home" shared by Father and Mother since 2020 and, with Father and Mother living separately since then, the "family unit" had seemingly already broken down long before Child's allegations came to light. And more to the point, the breakdown of a family unit— something that happens in every divorce case—is not necessarily a sign that a child is "without proper care." Here, the court made no findings connecting the breakdown of this family's unit to any inability on Father's part to provide Child the care he needed.

¶52 For the foregoing reasons, the uncontested facts cannot support a determination that Child is "without proper care" from Father. Thus, the juvenile court erred when it determined, on this record, that Child was dependent as to Father.[15]

CONCLUSION

¶53 Father did not make statements or take actions that conceded that Child was dependent, nor did he waive his right to contest the State's assertion of dependency. And on the merits of Father's claims, he has the better of the argument: the juvenile court erred in concluding that the uncontested facts supported a determination that Child was "without proper care" from Father. Accordingly, we reverse the court's order adjudicating Child dependent as to Father, and we remand this case for further proceedings consistent with this opinion.

---

15. Father raised an alternative argument on appeal, namely, that the "statutory definition of 'dependency' is unconstitutional as applied" to him. The State and the GAL assert that Father failed to preserve this argument for our review. But because we find merit in Father's main argument, we need not reach the merits of Father's alternative argument or make any decision about whether that argument was properly preserved.